**SCOTT PAPER COMPANY, Plaintiff,**

v.

**SCOTT'S LIQUID GOLD, INC., Defendant.**

Civ. A. No. 4766.

United States District Court, D. Delaware.

Sept. 23, 1977.

Rudolf E. Hutz, James M. Mulligan, and N. Richard Powers, of Connolly, Bore & Lodge, Wilmington, Del; John W. Kane, Jr., and John A. Weygandt of Scott Paper Co., Philadelphia, Pa., for plaintiff.

James F. Burnett of Potter, Anderson & Corroon, Wilmington, Del., Herbert Blecker, Nicholas John Stathis, Barry G. Kaiman, and Howard B. Barnaby, Jr., of Watson, Leavenworth, Kelton & Taggart, New York City, for defendant.

STAPLETON, District Judge.

This is an action for trademark infringement and unfair competition by plaintiff, Scott Paper Company, against defendant, Scott's Liquid Gold. Jurisdiction is founded on 28 U.S.C. §§ 1338(a) and (b). Defendant has challenged this Court's *in personam* jurisdiction over it under the substituted service provisions of 8 Del.C. § 382. I rejected defendant's contentions in this respect in an earlier, pre-trial Opinion,[1] and defendant has stipulated that, while it continues to dispute the correctness of this decision, no new evidence concerning this Court's *in personam* jurisdiction has come to light since my prior decision. I see no reason, therefore, to reconsider my earlier holding that defendant was subject to service of process under the Delaware long-arm statute and that it had sufficient contacts with this state to satisfy the constitutional requisites for this Court's exercise of jurisdiction over it.

Plaintiff's complaint is in three counts. Count I alleges that Scott's Liquid Gold's use of its corporate name on several liquid chemical household cleaning products constitutes infringement of nineteen registered trademarks owned by plaintiff, Scott Paper

---

1. 374 F.Supp. 184 (D.Del.1974).

Company.[2] Count II alleges that defendant's use of its corporate name and mark falsely attributes the origin of its products to plaintiff in violation of Section 43(a) of the Lanham Act.[3] Count III alleges that Scott's Liquid Gold by its use of "Scott" engages in unfair competition with plaintiff, appropriating to itself plaintiff's good will and reputation to the detriment of plaintiff and of the purchasing public who are confused thereby.

Plaintiff prays for an injunction against defendant's use of "Scott's" in connection with the advertising and sale of its products,[4] and, if justified by the facts adduced at trial, for damages and an accounting of profits, attorneys' fees, and costs and disbursements of this action.

Defendant denied the complaint's allegations, raised several affirmative defenses, and counterclaimed against the plaintiff. The affirmative defenses are essentially six-fold: (1) the name Scott is a common surname, in wide spread use as a business name and/or a trademark, and plaintiff is thereby entitled only to narrow protection against use of its mark by others for paper and paper-related products as designated in the patent office registrations and used by plaintiff in the marketplace; (2) plaintiff acquiesced in numerous third party uses of the mark "Scott" and variations thereof and thereby abandoned any claim it might have had to an exclusive right in its marks of a sufficiently broad scope to include defendant's liquid chemical household cleaning products; (3) defendant's earliest predecessor in interest, whose surname was Scott, adopted and continuously used the mark "Scott's Liquid Gold" in good faith from a date prior to the registration of plaintiff's marks and in some states prior to the date of first use of plaintiff's marks;

(4) plaintiff is barred from obtaining any relief by laches, acquiescence and estoppel; (5) plaintiff's marks are invalid because they were obtained on the basis of false and fraudulent statements to the United States Patent & Trademark Office; and (6) plaintiff is misusing its marks by bringing this action in bad faith to harass defendant and is, therefore, barred from relief by the doctrine of unclean hands.

Defendant has counterclaimed against plaintiff seeking (1) a declaratory judgment that certain of plaintiff's trademark registrations are invalid because they were falsely or fraudulently procured;[5] (2) an award of compensatory and punitive damages and attorneys' fees because of plaintiff's bad faith maintenance of this action; or, in the alternative, (3) if the Court finds likelihood of confusion between plaintiff's and defendant's marks, an injunction against plaintiff's use of such marks in Colorado because of defendant's prior use of the "Scott" mark in that geographic area. Plaintiff has denied the allegations in the above counterclaims.

## I. THE BACKGROUND FACTS

### A. *The Plaintiff*

Irwin and Clarence Scott organized the Scott Paper Company in 1879 to conduct a general jobbing business in paper goods in the Philadelphia area. (PX–159 at pp. 16–17). In the 1880's and 1890's with the advent of modern sanitary plumbing, the Scotts began to concentrate their efforts on cutting and converting toilet tissue rolls to the specifications of local merchants and packaging the finished product under the private labels chosen by the individual merchants. (PX–159 at pp. 17–21). Then in 1910, Scott Paper Company began manufacturing its own bathroom tissue (PX–159 at

---

**2.** The marks claimed by plaintiff to be infringed are set forth in Appendix A to this Opinion. Defendant has stipulated that these marks are owned by plaintiff (Pre-Trial Order at pp. 3–4).

**3.** 15 U.S.C. § 1125(a).

**4.** The products alleged to be infringing are (a) a product intended for use as a preservative and cleaner of household wood surfaces, (b) a prod-

uct intended for stripping and cleaning floors and (c) a product intended for cleaning and polishing household counter top and stainless steel surfaces.

**5.** Defendant also claims that certain marks should be cancelled because they have been abandoned by the plaintiff.

pp. 26, 30; PX–212 at p. 21), and marketing it primarily under the label "Waldorf". (PX–159 at pp. 21, 43). While it is clear from the record that Waldorf bathroom tissue has been marketed through most of its existence with an endorsement indicating "Scott" as its source, it has not been established that it carried such an endorsement from the outset. The record does demonstrate that Waldorf was advertised with a "Scott" endorsement as early as 1919.[6]

By 1910 the company had also begun to manufacture paper towels, and to sell them under the label "ScotTissue Towels". (PX–159 at p. 43; PX–150 at p. 2).[7] In 1913, the label ScotTissue was introduced on a brand of toilet tissue of higher quality than Waldorf which the company prior to that time had been selling under the name Sno-Tissue. (PX–159 at p. 44).

By 1914, sales of the two products then bearing the Scott name in their mark, ScotTissue towels and ScotTissue toilet paper, amounted to approximately $344,000.00.[8] (PX–169). By the next year, these sales had risen to $367,000.00.[9] Sales at this time were being made nationwide (PX–147 to 149, PX–155, PX–163, PX–159 at p. 64), and advertisements for ScotTissue towels were placed in publications of national circulation. (PX–242, PX–147 to 149). In 1915, the company obtained a registration for the mark "ScotTissue" for use on paper towels, paper table covers, paper diapers, and toilet paper. (PX–92).

National sales and advertising of all Scott Paper Company products increased remarkably over the next ten years (PX–266d, PX–152 to 153), and those products with the ScotTissue mark shared in that increase. (PX–170 to 173, PX–177).[10] In 1918, the company spent $62,000.00 on advertising, a large portion of which went to promote ScotTissue towels, both by direct mailings to prospective buyers and by advertisements placed in national magazines. Total sales of all Scott paper products, including ScotTissue towels and toilet paper amounted to $2,180,000 in that year.[11] By 1925, advertising reached nearly $300,000 and sales revenues rose to nearly $4 million. Also in that year, advertising emphasis switched from ScotTissue towels to ScotTissue toilet paper. (PX–159 at pp. 56–57). Full-page color advertisements for toilet tissues bearing the "ScotTissue" mark were carried in a number of women's magazines early in 1925. (PX–159 at p. 56).

In 1926, over 67 million rolls of ScotTissue and Waldorf toilet tissue were sold (PX–159), the latter frequently bearing the "Scott" endorsement on the package, (Gray Tr. Tr. at pp. 284–301, Markus Tr. Tr. at pp. 428–429; PX–150 at p. 2; PX–193, PX–227p–t; PX–231; PX–233; PX–235, PX–248 to 249; PX–251 to 252).

Over the next twenty-five years, Scott Paper Company's business continued to prosper. By 1950 its total advertising expenditures approached the $3 million mark and net paper sales amounted to $88 million. (PX–266d). Over half of the advertising expenditures during this year went to promote paper products bearing the name "Scott" in their mark and over half of the company's net sales constituted sales of such Scott-marked paper products. (PX–266c and a). During this time Scott endorsements continued to appear on many of the products which did not contain the name "Scott" in their mark. (PX–227d–h,

---

**6.** PX–150 at p. 2.

**7.** Plaintiff had traded in this product since approximately 1907 (PX–159 at pp. 23–24), but the record does not reflect whether it used the mark "ScotTissue" from this earliest date.

**8.** Towel sales represented $259,000.00 and toilet paper sales represented $85,000.00.

**9.** Paper towel sales represented $256,000.00; toilet paper sales represented $110,000.00. (PX–169).

**10.** Scott Paper Company during this period also began to establish a foothold in what was to become a widespread export market in over fifty countries. (PX–159 at pp. 65–67).

**11.** ScotTissue towels, ScotTissue toilet tissue and Waldorf toilet tissue constituted the company's major brands during this early period. (PX–159 at p. 47).

PX–227q–r, PX–227dd, PX–231, PX–233, PX–235 and PX–195).

Also during this period, the repertoire of Scott Paper Company products increased substantially. By 1950 the company was marketing, among others, ScotTowels,[12] Soft-Weve toilet tissue,[13] ScotTissue toilet paper, Scotties[14] facial tissues, and Scott windshield wiping tissues.[15] Scott Paper Company had begun promoting its products over national radio broadcasts in the 1930's (PX–161), and in the 1950's began using television as a promotional vehicle in addition to the newspaper and magazine advertising it had been doing all along. (PX–266c). In 1955, Scott Paper Company co-sponsored the "Omnibus" television program (PX–191), and began sponsoring the popular television series "Father Knows Best", which continued at least until 1959 (PX–193).

In 1958, the company obtained a registration for the name "Scott" standing alone for the following paper products: paper towels, paper napkins, toilet tissues, waxed paper, and sandwich bags. (PX–99). Three years later, it obtained a similar registration for beverage and food receptacles of paper and plastic. (PX–100).

Since the end of the 1950's, Scott Paper Company has introduced additional products, including Confidets Sanitary Napkins,[16] Scott place mats,[17] Cut-Rite plastic wrap and plastic bags,[18] Scott cups,[19] Family Scott napkins,[20] Lady Scott toilet tissues,[21] Lady Scott facial tissues,[22] and Scott glass cleaner concentrate, windshield wipers, foam air filters, auto-shop towels, and dispensers for various products.[23] It has obtained eleven additional registrations during this period, six of which protect simply the name "Scott" on various paper and plastic products and on the company's glass cleaner concentrate. Another three registrations protect the name "Scott" with the "S" design on household paper and plastic products.[24]

By 1959, plaintiff's *cumulative* advertising and promotion expenses for products bearing a "Scott" mark or endorsement had passed the $100 million mark. (PX–266d). In 1969, plaintiff's advertising and promotions of such products for the *single* year surpassed $30 million. (PX–266d). By 1975, advertising expenses exceeded $37 million. (PX–266d).

Similarly, in 1959, sales of products bearing the name Scott in their mark or the "Scott" endorsement exceeded $200 million. (PX–266a). Ten years later, sales had risen to over $300 million and by 1975 annual sales exceeded $450 million. (PX–266a). Sales of ScotTowels and ScotTissue toilet paper alone grew from over $100 million in 1960 to over $200 million in 1975. (PX–266a). In each of the years between 1965 and 1975, over one billion packages of plaintiff's products bearing the name "Scott" in their mark or their endorsement entered households around the country. (Markus Tr. Tr. at pp. 473–478).

In 1970, over 90% of Scott Paper Company's sales were retail sales made through

---

**12.** First significant sales in about 1931 (PX–266a).

**13.** First significant sales in about 1941 (PX–266a).

**14.** First significant sales in about 1943 (PX–266a).

**15.** First significant sales in about 1948 (PX–190).

**16.** First significant sales around 1962 (PX–266a).

**17.** First significant sales around 1964 (PX–266a).

**18.** First significant sales around 1964 (PX–266a).

**19.** First significant sales around 1965 (PX–266a).

**20.** First significant sales around 1969 (PX–266a).

**21.** First significant sales around 1964 (PX–266a).

**22.** First significant sales around 1964 (PX–266a).

**23.** See PX–193 and PX–240a.

**24.** PX–99 to 110, PX–96.

food stores. (DX–128). Throughout its history, Scott Paper Company's target purchaser for its retail brands has been the female head of household, as is evident from the advertising copy utilized as well as its emphasis on placing advertisements in national women's publications. (PX–159 at p. 56; PX–163; PX–175; PX–186, PX–187, PX–191, PX–192, PX–205).

In the 1960's, Scott Paper Company began considering expanding the scope of its product lines even further. Since 1963 or 1964, it has conducted and commissioned marketing studies on several occasions to ascertain logical areas of expansion in which the "Scott" name could be utilized to the company's advantage. (DX–105, DX–32, DX–107, DX–128, DX–106, DX–130, DX–70 and DX–72; Lippincott Tr. Tr. at pp. 724–728, 805–807, 827–831). One such area which plaintiff has considered in depth is the sale of household chemical cleaning products. (Markus Tr. Tr. at pp. 443–448; Lippincott Tr. Tr. at pp. 724–730; PX–66, DX–105, DX–107, DX–128, DX–106, DX–72). It is regarded by plaintiff's personnel as a logical area of product expansion for plaintiff. (DX–105, DX–107, DX–106, DX–72; Markus Tr. Tr. at pp. 443, 445–447; Lippincott Tr. Tr. at pp. 727–729).

In summary, since well before 1925, Scott Paper Company has sold and advertised in the national retail market a variety of household products which bear either trademarks including "Scott" or endorsements indicating "Scott" as their source. This marketing and advertising has been of very substantial volume. Scott Paper Company has never sold a liquid household cleaner, however.

## B. *The Defendant*

Defendant, a Colorado corporation organized in 1954 and headquartered in Denver (DX–465), sells three liquid chemical cleaners under the trademark "Scott's Liquid

Gold", a wood cleaner and preservative (DX–132a), a countertop and stainless steel cleaner (DX–527), and a floor cleaner and stripper (DX–132d).

Defendant's earliest predecessor in interest was a man named Lee Scott who sold a furniture polish under the name and mark "Scott's Liquid Gold". The earliest date for such sales which the record will support is 1925. (Pre-Trial Order, Stipulations of Fact Nos. 3 and 4 at p. 4).[25] Lee Scott sold that business to John and Mary Hartman in 1926 or 1927. The Hartmans continued to use the name and mark "Scott's Liquid Gold". (Pre-Trial Order, Stipulation of Fact No. 5 at p. 4), and in 1951, sold the business under that name to Jerome J. Goldstein and two of his brothers. For the $350 purchase price the Goldsteins received the business' inventory of bottles, labels and corks, as well as Lee Scott's secret formula for the furniture polish. (Pre-Trial Order, Stipulation of Fact No. 6 at pp. 4–5). In 1954, the present Company, Scott's Liquid Gold, Inc., was incorporated under the laws of Colorado and succeeded to the interests of the three Goldstein brothers in the Scott's Liquid Gold business. (Pre-Trial Order, Stipulation of Fact No. 7 at p. 5). Jerome J. Goldstein is President and Chairman of the Board of defendant corporation. (Goldstein Dep. at p. 4).[26]

Up until its purchase by the Goldsteins in 1951, the Scott's Liquid Gold business was confined almost entirely to door-to-door sales in the Denver area. (Carver Dep. at pp. 34–35, 44–45, 47; Kimpel Dep. at pp. 16–17). The only exceptions to this were sales to one department store in Denver (Kimpel Dep. at p. 46; Ethel Richardson Dep. at pp. 33–34) and, occasional sales in Greeley, Loveland and Colorado Springs, Colorado; Cheyenne, Wyoming; and Fort Scott, Kansas. (Hall Dep. at pp. 14–15; Kimpel Dep. at pp. 14–18; Maffett Dep. at

---

**25.** Mr. Goldstein testified that the Hartmans told him in 1951 that Scott's Liquid Gold had been sold since 1916. This evidence is hearsay, and in all likelihood double hearsay, however, when offered for the purpose of proving first use.

**26.** Hereinafter all depositions taken by parties in this litigation will be denoted by the deponent's name followed by Dep.

p. 59). Those witnesses familiar with either Lee Scott's or the Hartmans' business were unable to estimate the dollar volume or quantity of Scott's Liquid Gold sold over this period. (Carver Dep. at pp. 45–47, 49; Young Dep. at p. 17; Warneke Dep. at p. 16; Emery Richardson Dep. at p. 22; Diehl Dep. at pp. 40–41; Maffett Dep. at p. 82; Kimpel Dep. at p. 25).

Although both Rose and John Hartman owned the Scott's Liquid Gold business (Warneke Dep. at p. 20), Rose had primary responsibility for selling the furniture polish (Warneke Dep. at p. 20; Hall Dep. at pp. 6–7). During the early years of the business, John Hartman was involved in his own cigar manufacturing enterprise (Hall Dep. at pp. 23–24; Emery Richardson Dep. at p. 22; Kimpel Dep. at p. 5; Maffett Dep. at pp. 84–85), and then later on worked as a museum guard until his death in 1954 (Kimpel Dep. at p. 44; Ethel Richardson Dep. at pp. 28–29; Diehl Dep. at p. 41; Maffett Dep. at pp. 84–85). He did not get involved in the door-to-door selling operations of the business. (Ethel Richardson Dep. at p. 36; Warneke Dep. at p. 20).

At first, Rose Hartman had salesladies to help her distribute Scott's Liquid Gold (Carver Dep. at pp. 45–46; Kimpel Dep. at p. 5), but by ·the mid to late 1940's, she was distributing the product on her own (Emery Richardson Dep. at p. 22; Ethel Richardson Dep. at pp. 12–13, 34–35). By this time Rose was in her late 70's [27] and her eyesight was failing due to a cataract condition which eventually required surgery. (Warneke Dep. at pp. 10, 22–23; Young Dep. at p. 18; Diehl Dep. at p. 38). Eventually her failing eyesight and her inability to drive a car forced her to cease the door-to-door sales (Emery Richardson Dep. at p. 37), and caused her to sell the business (Diehl Dep. at p. 57). Over the twenty-four or twenty-five years that they had the business, the Hartmans accumulated approximately 15,000 receipts for the sale of Scott's Liquid Gold furniture cleaner and polish.

In 1951, when they first acquired the Scott's Liquid Gold business, none of the Goldstein brothers had much time to devote to it. Two were still in school and Jerome Goldstein, the most active participant, had a full-time job with a jewelry store which he kept until 1953. (Goldstein Dep. at pp. 41, 65). What time he did have was spent in the afternoons selling Scott's Liquid Gold to grocery and department stores. Other than mail orders referred by the Hartmans from old customers, sales by the partnership were limited to the Denver area. (Goldstein Dep. at pp. 37, 41). Goldstein [28] estimated that in 1951 sales amounted to roughly $1,000. (Goldstein Dep. at p. 40). The first newspaper advertisement for Scott's Liquid Gold was run during this year in the *Denver Post.* (DX–582a at p. 1).

In 1952, the partnership undertook a limited amount of advertising and promotional work, again in the Denver area. (Goldstein Dep. at pp. 57–58, 61). In addition, it retained the services of two sales representatives: one to push the Scott's Liquid Gold product in the western states of Colorado, Wyoming, Utah, New Mexico, Arizona and West Texas; and the other to handle business across the rest of the country. (Goldstein Dep. at pp. 58–59, 61–62, 119–120). Sales during this year did not exceed $5,000, however.

In 1953, Goldstein left his other employment and devoted all of his time to the Scott's Liquid Gold business. (Goldstein Dep. at p. 66). Sales in that year increased to $7,500. (DX–626). Goldstein succeeded in selling Scott's Liquid Gold to two distribution centers for the Safeway stores chain, one in Salt Lake City and the other in Denver which, together, supplied merchandise to local Safeway stores in Utah, Nevada, Idaho, Colorado, Wyoming, South Dakota, and Western New Mexico, Nebraska and Kansas. (Goldstein Dep. at pp. 63–64, 120–121, 121–122).

Advertising and promotion also picked up during 1953. The partnership ran a major one-half page two-color advertisement in

---

27. Rose was born in 1869 and John in 1873. (DX–462, DX–276).

28. Goldstein hereinafter refers to Jerome Goldstein the President of Scott's Liquid Gold.

the Denver area which was tied into a two-for-the-price-of-one promotional campaign. Stores in the area joined in with their own advertising and displays promoting the Scott's Liquid Gold product. (Goldstein Dep. at p. 65). Radio and television advertising were also used in and around Denver. (Goldstein Dep. at pp. 118–119). Attention focused on Utah through advertising and through a promotion campaign which involved the mailing of coupons to 250,000 households in the State. In all, however, the partnership spent only about $7,500 in advertising during that year. (DX–627).

In 1954, the business incorporated under the name Scott's Liquid Gold, Inc. Over the next five or six years Goldstein traveled across the country, attending national food conventions, lining up brokers to sell his product, working with those brokers in promoting and demonstrating Scott's Liquid Gold, and selling Scott's Liquid Gold himself to food chain and small grocery stores. (Goldstein Dep. at pp. 65–66, 74–75, 114–115; DX–504). Despite these efforts, however, sales during this period were limited in quantity and most were made in the Denver area. (PX–19 at pp. 8, 10; PX–29, ¶ 5; PX–18 at p. 8; PX–7 at p. 6). From 1954 to 1960, defendant made approximately the following expenditures on advertising and promotion and received approximately the following revenues from sales. (DX–626, DX–627):

| YEAR | ADVERTISING AND PROMOTION EXPENSES | SALES |
| --- | --- | --- |
| 1954 | $ 3,300.00 | $ 1,500.00 |
| 1955 | 4,400.00 | 3,300.00 |
| 1956 | 2,000.00 | 5,600.00 |
| 1957 | 2,200.00 | 12,000.00 |
| 1958 | 3,100.00 | 15,000.00 |
| 1959 | 1,800.00 | 19,000.00 |
| 1960 | no figure | 3,400.00 |

In 1961, Goldstein switched the focus of the company's efforts from retail sales to industrial and institutional sales. (Goldstein Dep. at pp. 75–78). He arranged for about 100 janitorial supply houses across the country to distribute Scott's Liquid Gold in one, five and fifty gallon containers. (Goldstein Dep. at pp. 75–76, 106). Institutional sales which had comprised 5% of the total sales in the 1950's (Goldstein Dep. at p. 77), accounted for nearly 75% of those sales in 1964. (PX–281a). Although this trend began reversing itself around 1964 (Goldstein Dep. at p. 78), and Goldstein continued the company's advertising and promotional efforts (Goldstein Dep. at pp. 76–78; DX–582a at pp. 46a–52), the total volume of retail sales remained at low level through 1968, reaching a high in that year of only $36,000. And retail sales outside of the Denver area were even smaller. In 1966, the only year for which figures are available, Denver retail sales accounted for $11,209 of the total retail sales of $17,847, implying sales for the remainder of Colorado and the rest of the country of only $6,500. (PX–281a, PX–281b). Up until 1968, Scott's Liquid Gold's business was confined predominantly to retail sales in the Denver area and industrial and institutional sales nationwide through jobbers. (PX–18 at p. 8; PX–7 at p. 6).

The year 1969 saw the beginning of a turn-around in these trends. Retail sales in that year predominated for the first time in about five years, accounting for over 70% of the total sales of $179,867. (PX–281a). Late that year defendant offered 116,000 shares of its stock to the public, earmarking about one-half of the proceeds for advertising. (PX–7 at p. 3). The following year Scott's Liquid Gold's expenditures on advertising and promotions increased six-fold to $688,000, and in 1971 such expenditures passed the $3 million mark. (DX–627). Sales of Scott's Liquid Gold rose concomitantly exceeding the $1 million mark in 1970 and reaching nearly $6 million in 1971. (DX–626). The year 1973 saw advertising and promotion expenditures reach $10 million and saw Scott's Liquid Gold capture 15% of the furniture polish market with sales of over $16 million. (DX–626, DX–627, DX–72 at p. 82).

That Scott's Liquid Gold was by this time receiving national exposure cannot be doubted. By 1970 it was being advertised on such popular national television programs as "Mike Douglas", "Johnny Carson", "David Frost", and "Merv Griffin". (DX–582a at pp. 58–65). In 1971, an article by Bernard Gladstone concerning the beneficial use of Scott's Liquid Gold for wood care appeared in the *New York Times*. (DX–620). Circulation for that issue of the Times was 1½ million. (DX–579, Admission No. 101).

On May 24, 1971 defendant applied for registration of the trademark "Scott's Liquid Gold" in the United States Patent Office. (DX–15). The Office published the mark in the Official Gazette on August 1, 1972 for opposition purposes. (DX–646). Plaintiff, after requesting and receiving a thirty-day extension in which to conduct an investigation to determine whether to oppose the registration (DX–15 at p. 13), decided not to oppose it. On December 19, 1972, the Patent Office granted defendant registration number 949,083 for "Scott's Liquid Gold". (DX–649).

In summary, defendant's predecessor marketed and sold a furniture polish under the name "Scott's Liquid Gold" in 1925. Prior to 1951 this business was confined almost entirely to door-to-door sales in the Denver area by Rose Hartman and, during the early years, by a few other salesladies. The business was sold in 1951 for $350. Between 1951 and 1968 more substantial efforts were made to promote products bearing the "Scott's Liquid Gold" mark, but these efforts met with only limited success. Beginning in 1969 and continuing up to the present, however, defendant's sales and advertising have increased dramatically. It is now a major factor in the national retail market for household cleaners.

## II. SECONDARY MEANING AND LIKELIHOOD OF CONFUSION

### 1. *The Legal Standards*

■ Owners of the protected trademarks are entitled, both at common law [29] and the Lanham Act [30] to be free from the use by others of marks which are similar and which are likely to cause confusion. *Alfred Dunhill of London, Inc. v. Kasser Distiller Products Corp.*, 350 F.Supp. 1341 at 1360 (E.D.Pa.1972), aff'd 480 F.2d 917 (3rd Cir. 1973). Inherently distinctive marks, such as fanciful or arbitrary words and symbols,[31] gain such protected status upon their first use on goods or services in the marketplace.[32] Non-distinctive marks, into which category fall surnames such as the one at issue here, gain the protection only upon their attainment of "secondary meaning".[33]

■ Secondary meaning refers to that quality of the mark's public recognition which causes those who are exposed to it in the marketplace to assume that the goods or services bearing the mark emanate from

---

**29.** See *Restatement of Torts* § 715, et seq.

**30.** See 15 U.S.C. § 1051, *et seq.*

**31.** Sometimes referred to at common law as "technical trademarks". *Sweetarts v. Sunline, Inc.*, 380 F.2d 923 (8th Cir. 1967); *Proxite Products, Inc. v. Bonnie Brite Products Corp.*, 206 F.Supp. 511 (S.D.N.Y.1962); 1 *McCarthy, Trademarks and Unfair Competition*, § 16:2.

**32.** *Blisscraft of Hollywood v. United Plastics Company*, 294 F.2d 694 (2nd Cir. 1961); *Caesar World, Inc. v. Caesar's Palace, Inc.*, 179 U.S. P.Q. 14 (D.Neb.1973); *George Washington Mint, Inc. v. Washington Mint, Inc.*, 349 F.Supp. 255 (N.D.Ohio 1972); *Proxite Products, Inc. v. Bonnie Brite Products Corp., supra*; 1 *McCarthy* §§ 11:2, 15:1, 16:2. *Cf., American*

*Petrofina, Inc. v. Petrofina of California, Inc.*, 189 U.S.P.Q. 67 (C.D.Calif.1975).

**33.** *Blisscraft of Hollywood v. United Plastics Company, supra; American Petrofina, Inc. v. Petrofina of California, Inc., supra; Dresser Industries, Inc. v. Heraeus Engelhard Vacuum, Inc.*, 267 F.Supp. 963 (W.D.Pa.1967), aff'd, 395 F.2d 457 (3rd Cir. 1968), cert. denied 393 U.S. 934, 89 S.Ct. 293, 21 L.Ed.2d 270 (1968); *Proxite Products, Inc. v. Bonnie Brite Products Corp., supra;* 1 *McCarthy* §§ 13:2, 15:1, 3 *Callman, Unfair Competition, Trademarks & Monopolies* (3d ed.) § 77.1; *Norm Thompson Outfitters, Inc. v. General Motors Corp.*, 448 F.2d 1293 (9th Cir. 1971); *Field Enterprises Educational Corp. v. Cove Industries, Inc.*, 297 F.Supp. 989 (E.D.N.Y.1969).

a single source,[34] even though the identity of that source may in fact be unknown to the. public.[35] As many courts have explained, adopting the language of the *G & C Merriam* opinion:

[Secondary meaning] contemplates that a word or phrase originally, and in that sense primarily, incapable of exclusive appropriation with reference to an article on the market, . . . might nevertheless have been used so long and so exclusively by one producer with reference to his article that, in that trade and to that branch of the purchasing public, the word or phrase had come to mean that the article was his product; in other words, had come to be, to them, his trademark.[36]

■ It is the plaintiff's burden to establish the existence of secondary meaning by a preponderance of the evidence. This may be done by direct evidence of the existence of the requisite association in the minds of the appropriate sector of consumers in the form of consumer testimony, consumer correspondence or market surveys. It may also be demonstrated by circumstantial evidence. One may infer from evidence that the consciousness of the consumers has been saturated with the mark in a manner tending to establish an association with plaintiff, that such an association in fact exists. Thus, a plaintiff may prove secondary meaning with evidence concerning the length and manner of its use of the mark, the amount of goods sold which bear the mark, the nature, extent, and geographic scope of plaintiff's advertising and promotion efforts, the absence of use of the same or similar mark by others in the relevant market, and any other factors related to its use and the character of the market which tend to promote the requisite association. See 1 *McCarthy* § 15:10, *et seq.*

■ If a mark is inherently distinctive or has achieved secondary meaning, the test of infringement then becomes one of likelihood of confusion between the owner's mark and the accused mark. *Kampgrounds of America, Inc. v. North Delaware A–OK Campgrounds, Inc., supra; Alfred Dunhill of London, Inc. v. Kasser Distillers Products Corporation, supra; Union Carbide Corporation v. Ever-Ready, Inc., supra; Proxite Products, Inc. v. Bonnie Brite Products Corp., supra;* 3 *Callman* § 80; 1 *McCarthy* § 15:1. Actual confusion in the marketplace need not be shown, the essence of infringement being simply the likelihood of confusion.[37] Nor must the accused product be competitive with that on which the owner's mark is used.[38] If the potential cus-

**34.** *Kampgrounds of America v. North Delaware A–OK Campgrounds, Inc.,* 415 F.Supp. 1288 (D.Del.1976), *aff'd* 556 F.2d 566 (3rd Cir. 1977); *Union Carbide Corp. v. Ever-Ready, Inc.,* 531 F.2d 366 (7th Cir. 1976), *cert. denied,* 429 U.S. 830, 97 S.Ct. 91, 50 L.Ed.2d 94 (1976); *Norm Thompson Outfitters, Inc. v. General Motors Corp., supra; G & C Merriam Company v. Saalfield,* 198 F. 369 (6th Cir. 1912), *cert. denied,* 243 U.S. 651, 37 S.Ct. 478, 61 L.Ed. 947 (1917); *Dresser Industries, Inc. v. Heraeus Engelhard Vacuum, Inc., supra;* 3 *Callman* § 77.1; 1 *McCarthy* § 15:2.

**35.** *Union Carbide Corp. v. Ever-Ready, Inc., supra, Kampgrounds of America v. North Delaware A–OK Campgrounds, Inc., supra ;* 3 *Callman* § 77.1; 1 *McCarthy* § 15:2.

**36.** *G & C Merriam Co. v. Saalfield, supra,* at 373. *See, also, Union Carbide Corp. v. Ever-Ready, Inc., supra; Kampgrounds of America v. North Delaware A–OK Campgrounds, Inc., supra; F. S. Services, Inc. v. Custom Farm Services,* 471 F.2d 671 (7th Cir. 1972); *National Automobile Club v. National Auto Club, Inc.,*

365 F.Supp. 879 (S.D.N.Y.1973), *aff'd* 502 F.2d 1162 (2nd Cir. 1974); 1 *McCarthy* § 15:2.

**37.** *Family Circle, Inc. v. Family Circle Associates, Inc.,* 332 F.2d 534 (3rd Cir. 1964); *Union Carbide Corporation v. Ever-Ready, Inc., supra; J. B. Williams Co., Inc. v. Le Conté Cosmetics, Inc.,* 523 F.2d 187 (9th Cir. 1975), *cert. denied* 424 U.S. 913, 96 S.Ct. 1110, 47 L.Ed.2d 317 (1976); *DeCosta v. Columbia Broadcasting System, Inc.,* 520 F.2d 499 (1st Cir. 1975), *cert. denied* 423 U.S. 1073, 96 S.Ct. 856, 47 L.Ed.2d 83 (1976); *W. E. Bassett Company v. Revlon, Inc.,* 435 F.2d 656 (2nd Cir. 1970); *Coca-Cola Company v. Clay,* 324 F.2d 198, 51 CCPA 777 (1963); 3 *Callman* §§ 80.6, 82.2; 2 *McCarthy* § 23:2. *But see,* 3 *Callman* § 80.6 and *DeCosta:* after lapse of substantial time failure to deceive the public is probative of absence of likelihood of confusion.

**38.** *Sears, Roebuck & Co. v. Johnson,* 219 F.2d 590 (3rd Cir. 1955); *Anheuser-Busch, Inc. v. DuBois Brewing Company,* 175 F.2d 370 (3rd Cir. 1949), *cert. denied* 339 U.S. 934, 70 S.Ct.

tomer would reasonably believe that the product bearing the accused mark originates from or is sponsored by the same source as the product bearing the owner's mark, then the owner is entitled to the protection of the trademark laws. The rationale behind extending a mark's protection to fields in which it has not yet been employed, was explained by Judge Learned Hand:

> The law of unfair trade comes down very nearly to this—as judges have repeated again and again—that one merchant shall not divert customers from another by representing what he sells as emanating from the second. This has been, and perhaps even more now is, the whole Law and the Prophets on the subject though it assumes many guises. Thereafter it was at first a debatable point whether a merchant's good will, indicated by his mark, could extend beyond such goods as he sold. How could he lose bargains which he had no means to fill? What harm did it do a chewing gum maker to have an iron monger use his trademark? The law often ignores the nicer sensibilities.
>
> However, it has of recent years been recognized that a merchant may have a sufficient economic interest in the use of his mark outside the field of its own exploitation to justify interposition by a court. His mark is his authentic seal; by it he vouches for the goods which bear it; it carries his name for good or ill. If another uses it, he borrows the owner's reputation, whose quality no longer lies within his own control, This is an injury, even though the borrower does not tarnish it, or divert any sales by its use; for a reputation, like a face, is the symbol of its possessor and creator, and another can use it only as a mask. And so it has come to be recognized that, unless the borrow-

er's use is so foreign to the owner's as to insure against any identification of the two, it is unlawful. . . . Here we are dealing with a proper name, which, though it has been used quite generally, is shown to denote the defendant when applied to flash-lights. The disparity in quality between such wares and anything the plaintiff makes no longer counts, if that be true. The defendant need not permit another to attach to its good will the consequences of trade methods not its own.

*Yale Electric Corporation v. Robertson*, 26 F.2d 972 at 973–974 (2nd Cir. 1928). *See also, Alfred Dunhill of London, Inc. v. Kasser Distillers Products Corp., supra*; 2 *McCarthy* § 24.

■ In a non-competing goods case the court, in assessing the likelihood of confusion must, of course, look to many of the same factors which are relevant in a competing goods case:

(1) The degree of similarity between the owner's mark and the accused mark.

(2) The strength of the owner's mark—how great and distinct an impact on the public mind can it be expected that owner's use and promotion of the mark has made.

(3) The expense of the goods and any other factors relating to the degree of care and attention one can expect of consumers when making purchases.

(4) The length of time the accused has used the mark without evidence of actual confusion arising.

(5) The intent of the accused in adopting the mark—if the accused believed he would benefit from the owner's good will this is strong evidence of the likelihood of confusion.

(6) Evidence of actual confusion.

664, 94 L.Ed. 1353 (1950); *Alfred Dunhill of London, Inc. v. Dunhill Shirt Company*, 213 F.Supp. 179 (S.D.N.Y.1963); *Proxite Products, Inc. v. Bonnie Brite Products Corp., supra*; *DeCosta v. Columbia Broadcasting Systems, Inc., supra*; *Communications Satellite Corp. v. Comcet, Inc.*, 429 F.2d 1245 (4th Cir. 1970), *cert. denied* 400 U.S. 942, 91 S.Ct. 240, 27 L.Ed.2d 245 (1970); *Polaroid Corporation v. Polaroid,*

*Inc.*, 319 F.2d 830 (7th Cir. 1963); *Triangle Publications, Inc. v. Standard Plastics Products, Inc.*, 241 F.Supp. 613 (E.D.Pa.1965); *Bacardi & Co., Ltd. v. Bacardi Mfg. Jewelers Co.*, 174 U.S.P.Q. 284 (N.D.Ill.1972), *aff'd.* 177 U.S. P.Q. 558 (7th Cir. 1973); *James Burrough Limited v. Lesher*, 309 F.Supp. 1154 (S.D.Ind.1969); 2 *McCarthy* § 24.

■ There are additional factors, however, which are particularly relevant in a case involving non-competing goods:

(1) Whether the goods, though not competing, are marketed through the same channels of trade and advertised through the same media avenues.

(2) The extent to which the targets of the parties' promotion and sales efforts are the same.

(3) The relatedness of the goods in the minds of the purchasing public by virtue of similarity of function, their use in conjunction with one another, or otherwise.

(4) Other factors bearing on the likelihood that consumers might expect to see a product of the owner in the contested market, such as (a) the size of the owner and the character and diversity of the product line bearing the owner's mark, (b) whether the contested mark is a logical avenue for expansion of the owner.[39]

## 2. Analysis Of The Circumstantial Evidence

■ There can be little doubt that plaintiff has established secondary meaning in the name "Scott" as applied to paper and plastic wares for personal and household uses. Extensive national advertising for over fifty years, burgeoning sales of Scott-marked or endorsed products which exceeded $450 million in 1975, and the continuous introduction over this period of a whole family of Scott personal and household products bearing the mark or endorsement "Scott", could leave little question in the consumer's mind that these products bearing the mark Scott originated from the same source.

Indeed, defendant does not seriously contend that the mark "Scott" has no secondary meaning, but rather points out that Scott is a common personal name and cites numerous third-parties who have applied and are applying that name or variations thereof to their products. Defendant argues, therefore, that plaintiff's mark is weak and entitled only to narrow protection in the fields to which plaintiff has already applied it. With four exceptions, however, the third-party uses which defendant has proved are in areas far less related to the market in which plaintiff sells than are defendant's products. These third-party uses include such items as grass seed (DC–20, DX–120), margarine (DX–86), socks (DX–121), tonic food supplements (DX–148, DX–602), ski boots (DX–484), and anti-gray hair toner (DX–160).[40]

■ While third-party uses in areas related to the owner's field may well be probative with respect to the weakness of the mark, the probative value of third-party uses in wholly non-related areas is limited. *Fleischmann Distilling Corporation v. Maier Brewing Company*, 314 F.2d 149 (9th Cir. 1963); *W. E. Bassett Company v. Revlon, Inc.*, 435 F.2d 656 (2nd Cir. 1970); *Tisch Hotels, Inc. v. Americana Inn, Inc.*, 350 F.2d 609 (7th Cir. 1965); 1 *McCarthy* §§ 11:24, 15:9. As *McCarthy* explains:

> Such wholly unrelated usage by third-parties may have little, if any, psychological effect upon buyers, and is, therefore, not a proper basis from which to infer that the mark must be "weak" or "nondistinctive".

1 *McCarthy* at p. 403.

The four exceptions are "Scot-Lad" Liquid Cleaners,[41] "Scotch-Brite" scouring pads

---

**39.** *E. g., Sears, Roebuck & Co. v. Johnson, supra; Alfred Dunhill of London, Inc. v. Kasser Distillers Products Corp., supra; Kampgrounds of America v. North Delaware A–OK Campgrounds, Inc., supra; Union Carbide Corp. v. Ever-Ready, Inc., supra; Restatements of Torts* §§ 729, 731; 3 *Callman* § 82; 2 *McCarthy* § 24:6.

**40.** See Appendices A and B to Defendant's Post-Trial Brief for a complete compilation of such third-party uses which are in evidence.

**41.** Bleach (DX–414), Fabric Softener (DX–415), Fabric Rinse (DX–416), Dishwashing Liquid (DX–417), Lemon Lotion for Dishes (DX–418). Scot-Lad had also sold paper products under the Scot-Lad label. Plaintiff objected and this use of the Scot-Lad label ceased as part of a settlement agreement with plaintiff. (DX–63; Markus Tr. Tr. at pp. 550–551).

(DX–610), Sanita Paper Products Company's "Scotties" straws (DX–442, DX–443) and "Scottie" laundry bleach, ammonia, and moth-proofer (DX–174). The "Scot-Lad" mark is noticeably distinct from plaintiff's, the word "Scot-Lad" being displayed along side of a representation of a young boy playing the bagpipes, thus emphasizing a Scottish theme for the product rather than the surname "Scott". Similarly, the mark "Scotch-Brite" conjures up a geographic connection rather than a connection to any person's name. While the "Scotties" mark on straws and on laundry bleach, ammonia, and moth-proofer, is more similar to plaintiff's marks, there is no indication in the record of how extensive the sales of these products were. In any case, these two related third-party uses do not convince me that plaintiff's mark is weak. I conclude, therefore, that plaintiff owns a strong mark which, depending on the weight of the other factors to be considered, may be entitled to protection beyond the scope of the products on which the mark has thus far been applied.[42]

 Balancing the others factors as well, I conclude that plaintiff has secondary meaning in the use of "Scott" as an endorsement on household cleaners and that defendant's use of the mark "Scott's Liquid Gold" is likely to cause confusion as to the sponsorship of its products.

There exists here that parallel between the marketing and use of the two parties' products which holds the potential for confusion of source or sponsorship. Plaintiff considers the ultimate purchaser of its products to be the female head of household and the ultimate user to be the household as a whole. (Gray Tr. Tr. at p. 315, Markus Tr. Tr. at p. 430). Similarly, defendant, since its early days, has considered the ultimate purchaser in its retail market to be the female head of household (Goldstein Dep. at p. 74), and has continued to the present to direct its retail advertising to this class of consumers. (DX–582a at pp. 71, 91, 99, 120, 125; DX–582b at pp. 5, 6, 8, 10, 16, 17, 20–22, 25, 27, 29, 38, 46, 49, 50, 51, 53, 69, 70, 72, and 80). It has also advertised its product as a multi-purpose household cleaner to be used by all members of the family. (See, for example, DX–582a at pp. 115, 124; DX–582b at pp. 9, 51).

Both parties advertise in the same media, placing by far the greatest emphasis on network-time television. (DX–72; DX–582a–c; Gray Tr. Tr. at pp. 282–284, 301–319; Markus Tr. Tr. at p. 439). The other major advertising by both plaintiff and defendant is done in national womens' magazines and in newspapers (PX–264, DX–582a–b; Gray Tr. Tr. at pp. 282–284, 301–319). In addition, both parties have utilized typical retail promotional devices, such as couponing and bonuses, in marketing their products. (DX–582a at pp. 117, 127; DX–582b at pp. 1, 20, 21, 28, 32, 38, 47, 48, 66, 67, 73, 61, 79; Goldstein Dep. at pp. 84–86; Gray Tr. Tr. at pp. 282–284, 301–319).

Plaintiff's and defendant's products are sold through virtually the same retail outlets,[43] and frequently are displayed on the

---

42. Defendant has also introduced into evidence several third-party registrations (see DX–3, DX–9–DX–11, and DX–625 which is a summary of third-party registrations for the marks "Scott" or variations thereof). Evidence of third-party registrations without accompanying proof of actual use is not probative on the issue of the mark's strength or weakness. *A. M. F., Inc. v. American Leisure Products, Inc.*, 474 F.2d 1403 (Cust. & Pat.App.1973); *Tiffany & Company v. National Gypsum Company*, 459 F.2d 527, 59 CCPA 1063 (1972); *Turner v. H. M. H. Publishing Company*, 380 F.2d 224 (5th Cir. 1967), *cert. denied* 389 U.S. 1006, 88 S.Ct. 566, 19 L.Ed.2d 601 (1967); *James Burrough Limited v. Lesher*, 309 F.Supp. 1154 (S.D.Ind. 1969); 1 *McCarthy* § 11:24.

43. Plaintiff sells over 90% of its packaged products through supermarkets and groceries. Non-food stores, such as discount department stores and drug stores account for the remainder of the sales. (Gray Tr. Tr. at pp. 315–319; Markus Tr. Tr. at pp. 437–439). However, Malcolm Gray, director of advertising services for plaintiff, testified that the percentage of sales made through non-food stores has been increasing over the past five years. (Gray Tr. Tr. at p. 319). Defendant sells its products through grocery, supermarkets, discount and variety stores, hardware stores, paint stores, lumber yards, drug stores and department stores. (PX–18 at p. 10; Defendant's Answers to Interrogatory No. 60). Although a precise breakdown of defendant's sales among these

shelves in close proximity to one another.[44] They are relatively inexpensive items, plaintiff's selling for around $.75 (Markus Tr. Tr. at p. 470), and defendant's selling for around $2.00 to $3.00 (PX–132a, c, d). None represent major purchases over which consumers would be expected to spend a great time inspecting either the products on their labels. *See, Restatement of Torts* § 731(g), *Proxite Products, Inc. v. Bonnie Brite Products Corp., supra.*

Moreover, the products are functionally related. Both parties' products have household cleaning functions, and at least one of plaintiff's products, paper towels, may be used in tandem with defendant's liquid cleaners. In fact, the label on one of defendant's products suggests that the cleaner be applied and wiped off with a "clean soft cloth or paper towel".[45] Scott towels and Waldorf paper towels with the "Scott" endorsement have been among plaintiff's largest selling items for the last fifteen years. (PX–266a).

The record also contains evidence tending to show that the public may consider the household cleaning market a logical area for plaintiff's expansion. The evidence that plaintiff, since 1964, has given serious consideration to marketing a household cleaner is circumstantial evidence supporting this inference. In addition, there is some direct evidence of a public perception that this type of expansion by plaintiff was a logical step. The depositions of a number of consumers indicate that they perceived plaintiff as a large diversified firm in the household products market which could be expected to market a household cleaner. (Kyler Dep. at pp. 31, 44–46, 55–56; Hitson Dep. at p. 37; Foley Dep. at p. 16; Rosenthal Dep. at pp. 38, 55–56).

Furthermore, both plaintiff's and defendant's marks use the name "Scott" as a surname to identify the source of their goods. Defendant's mark consists of the words "Liquid Gold" in print with the designation "Scott's" immediately preceding those words in a somewhat smaller script. (DX–132a–d; DX–277). The effect of this arrangement is to suggest "Scott" as the source of defendant's Liquid Gold product. This is similar to plaintiff's pervasive use of the name "Scott", as a part of its marks and in its endorsements, to suggest that the products so labeled originate from the one source identified as Scott. (PX–195–204; PX–206; PX–213–224; PX–227a–11; PX–251a–p; PX–252a–y; PX–253a–c; PX–254–258; Gray Tr. Tr. at pp. 284–301; Markus Tr. Tr. at pp. 428–429; Lippincott Tr. Tr. at p. 705).

■ It is true that no consumer would be likely to view the mark Scott's Liquid Gold and mistake it for any of plaintiff's individual marks. But this is not the relevant consideration. The question is not whether purchasers will confuse the marks, but whether the use of the mark is likely to cause confusion among the purchasers as to sponsorship of the goods in question. *A. M. F., Inc. v. American Leisure Products, Inc.*, 474 F.2d 1403 (Cust. & Pat.App.1973); *Application of West Point Pepperell, Inc.*, 468 F.2d 200 (Cust. & Pat.App.1972).

■ While the marks as a whole are to be examined for the purpose of determining whether or not they are confusingly similar,[46] the entirety of the owner's mark need not be appropriated for there to be a likeli-

---

various categories was not made part of the record, a market study introduced into evidence by plaintiff did show that as a general rule 85% of the sales of furniture polish are estimated to take place through food stores and another 10% through discount stores. (*See also*, DX–128 at p. 4).

**44.** *See* PX–90; PX–91; PX–239a–g; DX–91; DX–92; DX–127a and b. *But see*, DX–96 and 97; 113a and 113b.

**45.** PX–132c, Scott's Liquid Gold Foamy Counter Top Polish and Cleaner.

**46.** *Dresser Industries, Inc. v. Heraeus Engelhard Vacuum, Inc., supra; Kampgrounds of America v. North Delaware A–OK Campgrounds, supra; Martin v. Crown Zellerbach Corp.*, 422 F.2d 918, 57 CCPA 968 (1970), *cert. denied* 400 U.S. 911, 91 S.Ct. 140, 27 L.Ed.2d 151 (1970); *B. Rich's Sons, Inc. v. Freida Originals, Inc.*, 176 U.S.P.Q. 284 (T.M.T. & App.Bd. 1972).

hood of confusion,[47] and the Court may give greater emphasis to the dominant portion of the marks in question.[48] There can be no question that "Scott" dominates plaintiff's marks. Although not true of defendant's marks, it is true that "Scott" is that portion of the mark which is most suggestive of the sponsorship of defendant's goods.[49]

In summary, the ordinary purchasers of both plaintiff's and defendant's products are female heads of households. Given the relative inexpensiveness of the products involved, they can not be expected to exercise great care in their purchase.[50] Adding to this the fact that the products are functionally related, are distributed through the same retail channels, often in close proximity to one another, and are advertised through the same media, I would conclude, without regard to any evidence of actual confusion, that defendant's use of "Scott's", the dominant portion of plaintiff's mark, in a manner to designate the origin of defendant's products, is likely to cause confusion as to the sponsorship of defendant's goods.

3. The Evidence Of Actual Confusion

In addition, the record contains evidence of substantial actual confusion which cannot be ignored by this Court. *Union Carbide Corp. v. Ever-Ready, Inc., supra.* Over the past several years, plaintiff and defendant have received a number of letters and some telephone calls from consumers evidencing their confusion as to the source of defendant's goods. (PX–41–43; PX–46–49; PX–52–56; PX–113–117; PX–120–121). Many of the letters refer to the buyers' surprise at finding flaws in the Scott's Liquid Gold product in light of their past satisfaction with Scott's paper products. (See, for example, PX–41; PX–46; PX–48; PX–52). Others are letters addressed to plaintiff reflecting consumers' enjoyment of the Scott's Liquid Gold television commercial (PX–113; PX–118), or their inability to locate one of defendant's products (PX–120; PX–121). A few letters concerning displeasure with defendant's products referred simply to the consumer's past satisfaction with "Scott" products (PX–43; PX–54; PX–55). Depositions subsequently taken by plaintiff verified that the "Scott" products referred to in the letters were plaintiff's products. (Kyler Dep. at p. 6; Poppe Dep. at pp. 8–9; Rosenthal Dep. at p. 9).

Plaintiff deposed, in addition, several other consumers who had written letters indicating their confusion as to sponsorship of defendant's products. Of those deposed, most were female household heads who had purchased household products for many years. These consumers testified that they were familiar with and had purchased and

47. *Carter-Wallace, Inc. v. Proctor & Gamble Company*, 434 F.2d 794 (9th Cir. 1970); *Independent Nail & Packing Company, Inc. v. Stronghold Screw Products*, 205 F.2d 921 (7th Cir.), *cert. denied* 346 U.S. 886, 74 S.Ct. 138, 98 L.Ed. 391 (1953); *Pikle-Rite Company v. Chicago Pickle Company*, 171 F.Supp. 671 (N.D.Ill. 1959); *Proxite Products, Inc. v. Bonnie Brite Products Corp., supra.*

48. *Continental Scale Corp. v. Weight Watchers International, Inc.*, 517 F.2d 1378 (Cust. & Pat. App.1975); *Martin v. Crown Zellerbach Corp., supra; Carter-Wallace, Inc. v. Proctor & Gamble Co., supra; Independent Nail & Packing Company, Inc. v. Stronghold Screw Products, supra; Pikle-Rite Co. v. Chicago Pickle Co., supra.*

49. *See S. C. Johnson & Son, Inc. v. Gaston Johnston Corp.*, 305 F.2d 474, 49 CCPA 1225 (1962) ("Johnston's No Roach" would infringe "Johnson Ant Killer" even though "No Roach" dominates the mark, because its dominance is

not so great that it eliminates Johnston as an indication of the source or origin). *See also, Caron Corporation v. Ollendorff*, 160 F.2d 444 (2nd Cir. 1947) ("when less than the whole of a plaintiff's mark is used by a defendant, in order to sustain a charge of infringement 'it must appear that the part . . . taken identifies the owner's product without the rest'. *Parfumerie Roger & Gallet v. M. C. M. Company*, 2 Cir. 24 F.2d 698, 699". 160 F.2d 444 at 445). *Cf. Independent Nail & Packing Co. v. Stronghold Screw Products, supra* ("an unfair competitor need not copy the entire mark to accomplish his fraudulent purpose. It is enough if he takes the one feature which the average buyer is likely to remember". Quoting *Nims on Unfair Competition and Trade-Marks*, 4th Ed. Vol. 1 at p. 678).

50. *See Restatement of Torts* § 731(g); *Proxite Products, Inc. v. Bonnie Brite Products Corp., supra.*

used plaintiff's products for many years. They were pleased with what they regarded as the high quality of plaintiff's products. (Kyler Dep. at p. 4; Hitson Dep. at p. 4; Riffle Dep. at pp. 5–6; Foley Dep. at pp. 8–9; Scheuringer Dep. at p. 14; Rosenthal Dep. at p. 5; Poppe Dep. at p. 4). Several testified that they tend to buy products of a company with whom they are pleased and that they purchased defendant's products as the result, in part, of a misapprehension that they were manufactured by plaintiff. (Kyler Dep. at pp. 9–10; Riffle Dep. at pp. 13–14; Scheuringer Dep. at pp. 10, 14, 33; Rosenthal Dep. at p. 45). As one witness testified, "Knowing Scott's products, I figured, well, this should be good, I will try it". (Scheuringer Dep. at p. 14).

The witness classified both plaintiff's and defendant's products as household products (Kyler Dep. at pp. 8–9; Hitson Dep. at p. 8; Riffle Dep. at p. 22; Puder Dep. at p. 15; Foley Dep. at pp. 16–17; Rosenthal Dep. at pp. 37–38; Poppe Dep. at p. 15), and several attributed their confusion to the fact that two such household products both bore the name "Scott" (Kyler Dep. at pp. 8–9; Hitson Dep. at pp. 8, 37; Riffle Dep. at pp. 12, 22; Rosenthal Dep. at pp. 11, 37–38). As a witness observed, "I just assumed that household products were made by the same company". (Kyler Dep. at p. 44). One witness noted the complementary function between the products of the two companies stating "I really do most of the time use Scott's paper towels to clean it [defendant's product] off". (Foley Dep. at p. 14).

Significantly, in responding to defendant's cross-examination, several witnesses stated that they would not associate the products of other companies bearing the name "Scott", for example, Scott's lawn products and Scott Electric Company, with plaintiff because such products were not household products. (Kyler Dep. at pp. 44-49; Hitson Dep. at pp. 36–37; Riffle Dep. at p. 22). The following colloquy illustrates the perceptive abilities of the consumers:

Q You also indicated that you have used Scott's Grass Seed?

A Right.

Q And I assume you think that's also made by the same company [the plaintiff]?

A Now that I think things over, I wondered why I didn't but I think because this [defendant's product] is for cleaning and kitchen. I can see why I thought it was now because it's for cleaning and care in the home.

(Riffle Dep. at p. 22).

While the consumers indicated that they do not closely scrutinize the labels or packages when they are grocery shopping (Kyler Dep. at pp. 37, 56–57; Hitson Dep. at p. 34; Rosenthal Dep. at p. 45), they did examine the labels when they became dissatisfied with the product and sought to identify the manufacturer's address. Closer scrutiny of the label still did not trigger awareness that the products were manufactured by separate and distinct companies. This was true either because it did not occur to the consumer to compare the mailing address on plaintiff's and defendant's products to determine if they were the same. (Rosenthal Dep. at p. 56; Kyler Dep. at pp. 55–56), and/or because the consumers assumed that the defendant was a division or subsidiary of plaintiff. (Kyler Dep. at p. 56; Hitson Dep. at pp. 35–36; Foley Dep. at p. 16; Rosenthal Dep. at p. 56). One consumer's testimony is typical of the level of sophistication or awareness of purchasers of the products in question:

I bought a product, I was displeased with the product. I wrote a letter and I didn't run around the house to see if the paper company and this were one. It was Scott and I looked at the label [for the address]. I know some companies have divisions in different parts of the country, you know; that at least I know, but I don't go around reading company labels.

(Rosenthal Dep. at p. 56).

In addition to consumer confusion letters, plaintiff and defendant also received communications from the retail outlets they dealt with indicating confusion as to the source of defendant's products. (PX–44, 45, 118, 119, 122, 123, 126). Typically, the retail outlets wrote plaintiff requesting reim-

bursement for a refund they were forced to give on a Scott's Liquid Gold product. Barbara Russo, consumer adviser with the Consumer Protection Board for the State of New York, also wrote plaintiff referring a letter of dissatisfaction her agency had received from a Scott's Liquid Gold customer. (PX–50; PX–51; PX–65). Although such letters do not necessarily evidence confusion among the ultimate purchasers of plaintiff's and defendant's products, they are significant in that they reflect confusion among those who, as a result of their daily activities, could be expected to have more knowledge about the sponsorship of various products and to exercise greater care than the ordinary purchaser in differentiating among sponsors of those products.

These communications from consumers, retailers, and government agencies do not represent as defendant suggests, isolated instances of confusion, resulting from carelessness and inattentiveness on the part of the purchasers. Rather, they evidence a pattern of confusion in the marketplace which is likely to continue as long as both parties use the mark "Scott" on household cleaning products.

■ In addition to the evidence of specific instances of actual confusion, plaintiff has also introduced survey evidence relating to the issue of likelihood of confusion. While this survey evidence was admissible [51] and is of some probative value on that issue, its design is flawed and I have not accepted all of its reported results as relia-

ble indicia of the amount of confusion in the marketplace.

Prior to bringing suit, plaintiff commissioned Consumer/Industrial Research ("CIR") to conduct a market survey. CIR developed a five question telephone survey, two questions of which related directly to the confusion issue. Question one asked:

Have you heard of a product called Scott's Liquid Gold, that is best known as a wood cleaner but may also be used for other cleaning jobs?

1. Yes 2. No

Question 3a, the "unaided awareness" question, which was put to any respondent who had heard of Scott's Liquid Gold, asked:

Can you name any other products which you believe may be made by the manufacturer of Scott's Liquid Gold? Any others?

Question 3b, the "aided awareness" question, also put to any respondent who had heard of Scott's Liquid Gold, asked:

As I read each of the following product categories, will you tell me please if you think the manufacturer of Scott's Liquid Gold also manufactures that product? The first one is . . .

Random start
 Audio/stereo equipment
 Lawn fertilizers/seed/weed killers
 Paper towels
 Toilet tissue
 Facial tissue
 Outboard motors for boats
 Other: _____
 Not aware of any products

---

**51.** While defendant made no timely objection at trial to the admissibility of the survey interview sheets and compilations thereof in report form, its brief contends that these documents are hearsay because no interviewers were called at trial to be cross-examined on the manner in which they conducted the interviews and the accuracy of the records made of the responses. Defendant did have an opportunity to cross-examine the supervisor of the survey who instructed the six to eight interviewers, who observed their calling and recording, and who monitored a random sample of their calls by listening in on another line. Defendant's hearsay objection is without merit for another reason, however. Mr. Rullo, who testified as an expert in consumer awareness studies, expressed the opinion that if the entire universe

of female heads of households were asked the questions in the survey, certain percentages, within various ranges plus or minus, would respond in given ways. The basis for this opinion was the survey documents. The overall import of his testimony was that the survey was conducted in accordance with industry standards and that this data was of a type reasonably relied upon by experts in his particular field. With this background, the documents are admissible under Rule 703. The comments to that rule suggest that it "offers a more satisfactory basis for ruling upon the admissibility of public opinion poll evidence". The Committee notes that "attention is directed [under the Rule] to the validity of the techniques employed rather than to relatively fruitless inquiries whether hearsay is involved".

The universe sampled for the purpose of the survey consisted of female heads of households. Certain geographic areas, such as Philadelphia and Denver, which had a particular association with plaintiff or defendant were eliminated from this survey. CIR found that out of 200 respondents who were familiar with Scott's Liquid Gold, 7% listed paper towels, toilet tissues or facial tissues in answer to the unaided awareness question.[52] Sixty percent of those familiar with Scott's Liquid Gold chose one, two or all three of these products in answer to the aided awareness question.[53]

I find no significant problem with the selection of the sample or with the manner in which the survey was executed. It was conducted by an experienced firm in a professional manner. However, the form of the questions asked impairs the reliability of the results to a minor degree in the case of Question 3a and to a substantial degree in the case of Question 3b.[54]

Question 3a suggests to the respondents that the maker of Scott's Liquid Gold cleaner makes other products. This suggestion was unnecessary as defendant's expert, Dr. Sorenson, explained:

Stage one might be something like this: "some manufacturers make one product only; some manufacturers make more than one product. Do you think that the manufacturers of Scott's Liquid Gold make one product or more than one product?

Stage two then would be asked only of those people who responded that they believed that more than one product is

made. In that way, nobody would be compelled to make any assumptions. Those people who are convinced because of their own knowledge or their own perception of Scott's Liquid Gold, their own use, whatever their reasoning happens to be, that there is only one product made, would be thereby able to say there was only one product and would not be forced to assume anything else.

(Sorenson Tr. Tr. at pp. 1781–1782).

I think it unlikely, however, that this unnecessary suggestiveness substantially affected the survey results. Although some respondents may have been encouraged to make a choice where they otherwise might have remained silent, nothing in the form of the question suggested that they choose paper products. Those who did choose these products, did so independently.[55]

A more serious problem is posed by Question 3b coming, as it did, on the heels of Question 3a. This question was asked of all 200 respondents familiar with Scott's Liquid Gold, regardless of how they answered Question 3a. Thus, the 153 respondents who were unable to name any products in Question 3a, were then asked to consider a list of six products. It would be reasonable for a respondent faced with this sequence of questions to assume that her first answer was inadequate and that she should, therefore, attempt to name some of the products listed. (Sorenson Tr. Tr. at p. 1785). Paper towels, toilet tissue, and facial tissue would be the logical products for the female household heads who were the subject of the survey to name. This format strongly

**52.** An additional respondent listed Scott's napkins in response to this question. See, PX–238, interview sheet 102. This brings the total picking paper products on an unaided awareness basis to 7.5%.

**53.** One hundred five or 52.5% chose all three. (Sorenson Tr. Tr. at p. 1918).

**54.** The questions were formulated by plaintiff, not CIR.

**55.** The probativeness of questions similar to 3a has been tested and upheld in several instances. *Union Carbide Corp. v. Ever-Ready, Inc., supra; International Milling Co. v. Robin Hood Popcorn Co., Inc.,* 110 U.S.P.Q. 368 (Commis-

sioner of Patents 1956); *Sperry-Rand Corp. v. Seawol Distributors, Inc.,* 140 U.S.P.Q. 532 (S.D.Cal.1964). *But see General Motors Corporation v. Cadillac Marine & Boat Company,* 226 F.Supp. 716 (W.D.Mich.1964). Two of the cases cited by defendant are inapposite in that the courts in both failed to reach the issue of whether the form of the question asked was leading. *Miles Laboratories, Inc. v. Frolich,* 195 F.Supp. 256 (S.D.Calif.), *aff'd* 296 F.2d 740 (9th Cir. 1961), *cert. denied* 369 U.S. 865, 82 S.Ct. 1030, 8 L.Ed.2d 84 (1962); *National Biscuit Co. v. Princeton Mining Company,* 137 U.S.P.Q. 250 (T.M.T. & App.Bd.1963), *aff'd* 338 F.2d 1022, 52 CCPA 844 (1964).

encouraged a respondent to guess and then suggested a series of products among which the only household products were paper products. This substantially limits the probative value of the responses to Question 3b. *Cf. Zippo Manufacturing Co. v. Rogers Imports, Inc.,* 216 F.Supp. 670 (S.D.N.Y. 1963); *LeMaur, Inc. v. Alberto-Culver Co.,* 496 F.2d 618 (8th Cir.), *cert. denied* 419 U.S. 902, 95 S.Ct. 186, 42 L.Ed.2d 148 (1974).

While I would be reluctant to base a holding solely upon the results of the CIR survey,[56] I find the responses to Question 3a confirmatory of the conclusion I have reached on the basis of the circumstantial evidence and the evidence of specific instances of confusion—plaintiff's use of "Scott's" on its household cleaning products causes a likelihood of confusion in the marketplace. *Grotrian, Helfferich, Schulz, Th. Steinweg Nachf v. Steinway & Sons,* 365 F.Supp. 707 (S.D.N.Y.1973), *aff'd* 523 F.2d 1331 (2nd Cir. 1974) (8% "strong evidence of likelihood of confusion"). As a result of the text of Question 3b and the context in which it came, I conclude that the responses to that question are of little probative value.[57]

### III. PRIORITY

Plaintiff has established that a substantial number of consumers in the national market for household cleaners currently associate the word "Scott's" with plaintiff and that, accordingly, there exists a likelihood of confusion as a result of defendant's use of "Scott's" in connection with its household cleaning products. This alone is not enough, however. It must also establish priority.

▇▇▇▇ In the case of non-inherently distinctive marks, such as the mark "Scott" here in issue, priority of ownership depends not on the first use of the mark, but rather upon the first acquisition of secondary meaning in the mark. *Sweetarts v. Sunline, Inc.,* 380 F.2d 923 (8th Cir. 1967); *General Radio Company v. Superior Electric Company,* 321 F.2d 857 (3rd Cir. 1963); *Borg-Warner Corporation v. York-Shipley, Inc.,* 293 F.2d 88 (7th Cir. 1961); *Speed Products Company, Inc. v. Tinnerman Products, Inc.,* 179 F.2d 778 (2nd Cir. 1949); *beef & brew, inc. v. Beef & Brew, Inc.,* 389 F.Supp. 179 (D.Ore.1974); *Marion Laboratories, Inc. v. Michigan Pharmacal Corp.,* 338 F.Supp. 762 (E.D.Mich.1972), *aff'd* 473 F.2d 910 (6th Cir. 1973); *National Color Laboratories, Inc. v. Philip's Foto Company, Inc.,* 273 F.Supp. 1002 (S.D.N.Y.1967); 1 *McCarthy* § 16:13.[58] When dealing with non-competitive goods such as plaintiff's

**56.** The ultimate conclusion which I reach would not be different in the absence of the survey evidence.

**57.** Defendant also challenges the probativeness of the survey because it does not indicate that the respondents were referring to plaintiff when they named paper products. It is true that the survey does not prove that "Scott" when used on paper products has a secondary meaning associated with plaintiff. As earlier noted, however, this portion of plaintiff's burden has been convincingly carried by other evidence. The survey was offered to show likelihood of confusion and it is of probative value on that issue.

**58.** Although the question often asked by the court is whether plaintiff's mark had acquired secondary meaning as of the time defendant *entered* the market (*see Sweetarts v. Sunline, Inc., supra; General Radio Company v. Superior Electric Company, supra; Speed Products Co., Inc. v. Tinnerman Products, Inc., supra; beef & brew, inc. v. Beef & Brew, Inc., supra; Marion Laboratories, Inc. v. Michigan Pharma-*

*cal Corp., supra*), I conclude that this is simply the conservative method of determining whether plaintiff's mark has acquired secondary meaning at a sufficiently early stage. That is, if the mark has acquired secondary meaning as of the time defendant enters the market, *a fortiori* it had secondary meaning prior to the time defendant began acquiring public recognition of its own mark.

Thus, if both parties utilize the same or similar marks but neither has yet acquired secondary meaning, neither party could obtain an injunction against the other since without that secondary meaning there could be no likelihood of confusion. The public's impression at this point is consistent with the existence of two independent sources. Once one mark obtains secondary meaning, however, the other's use of that mark could be enjoined despite the fact that the other had been using its mark for a while. 1 *McCarthy* § 16:13. The key question is whether plaintiff's mark acquired secondary meaning in the marketplace prior to such extensive use by the defendant in its mark that defendant's mark had gained public acceptance

and defendant's products, this means that the party desiring to establish priority in another's market must demonstrate that its mark was the first to acquire secondary meaning in that other's market. *S. C. Johnson & Son v. Johnson*, 175 F.2d 176 (2nd Cir. 1949); 1 *McCarthy* § 16:13.

Because of the substantial change in marketing emphasis over defendant's history, it is necessary to examine the issue of priority here in terms of both the national market and the local market of Denver.

## A. National Market

Plaintiff maintains that it is entitled to foreclose the defendant's use of "Scott's" in the national market for household cleaners because plaintiff had established secondary meaning in "Scott's" in that market before defendant's activities there generated secondary meaning for it. This contention poses two questions. When would a substantial number of consumers in the national market for household cleaners first have associated a new household cleaner endorsed with the name "Scott's" with the same source as plaintiff's household products? And, when would a substantial number of consumers in the national market for household cleaners first have associated a new household cleaner endorsed with the name "Scott's" with the same source as defendant's household cleaning products and whether, by that time, consumers making the association with defendant's products would also believe that they emanated from the same source as plaintiff's products.

■ By 1965, plaintiff had already experienced extensive and diversified growth in the national household products market. It was by then marketing substantial quantities of all of the products it now markets and, while its total advertising and promotional outlays were somewhat less at that

point than in 1975[59] plaintiff had theretofore invested well over $150,000,000 in advertising and promotion, the vast majority of which had been directed to the female head of household and her household needs. Nor were these advertising and promotional activities materially different in character or geographic scope than plaintiff's activities in the mid-70's. Indeed, by 1965, all save one of the factors upon which I have relied in finding secondary meaning associated with plaintiff and a likelihood of confusion from defendant's recent use of "Scott's" on liquid household cleaners, also existed in 1965. The logical inference to be drawn from that evidence is that a substantial number of consumers would have associated a new household cleaner endorsed with the word "Scott's" with the source of plaintiff's household products as early as 1965. Thus, plaintiff had acquired secondary meaning in that endorsement by that year.

The only difference between the record as it relates to the mid-70's and to 1965 is, of course, that there was no evidence of actual confusion in 1965. The reason for this is obvious when one turns to the pre-1965 activities of defendant to inquire whether it had acquired secondary meaning in "Scott's" as of that year. By 1965, although defendant had made limited sales of its original product to institutional and industrial customers throughout the country, its sales in the household cleaning market outside the Denver area and its advertising beyond that area were insignificant. Defendant's *total* retail sales, for example, had been: 1955–$3,300; 1957–$12,000; 1959–$19,000; 1960–$3,400; 1964–$9,324; and 1965–$10,591 (DX–626). And the vast majority of these sales were in Denver.[60] From 1956 to 1959 defendant's total advertising and promotion expenses were: $2,000; $2,200; $3,100; $1,800, respectively; and from 1963 to 1965 such expenses were

as a hallmark of defendant's products. *Borg-Warner Corp. v. York-Shipley, Inc., supra; National Color Laboratories, Inc. v. Philip's Foto Company, supra;* 1 *McCarthy* § 16:13.

**59.** Around $15,000,000 as opposed to around $30,000,000. (PX–266b).

**60.** Even by 1966, when national retail sales totaled $17,847, Denver sales accounted for $11,209.50.

$1,500; $800; and $4,500 (DX–627). The record suggests that virtually all of this was directed at the Denver market. Thus, defendant had not entered the national market for household cleaners in any significant way by 1965 and it is apparent that defendant, in that year, could not have acquired secondary meaning in "Scott's" in that market.

Plaintiff has established priority in the national household cleaner market.

## B. Regional Market

■ This finding does not mandate a conclusion that plaintiff is entitled to foreclose defendant from using "Scott's" in connection with household cleaner sales in Denver or that plaintiff may market a "Scott's" household cleaner there. The question of priority with respect to that market is a distinct question.[61] If defendant acquired secondary meaning in "Scott's" in the Denver market before plaintiff did, defendant may continue use in that market and is entitled to some form of protection there.[62]

I have previously concluded that plaintiff, by 1965, had acquired secondary meaning in "Scott" in the national market for household cleaners. Nothing in the record suggests that the impact of these efforts was any less in Denver than elsewhere in the country and I conclude that secondary meaning had been achieved by plaintiff in that year in the Denver household cleaning market.[63] Thus, the crucial question is whether defendant had established secondary meaning prior to 1965. I conclude that it had not.

Defendant's earliest predecessor adopted the mark "Scott's Liquid Gold" in 1925 and the product was continuously sold door-to-door under that mark from 1925 to 1951. The $350 purchase price paid for the business in 1951 suggests, however, that those

best informed on the subject did not assess it as having accumulated substantial good will as of that time. It was not until 1953 that a serious effort was undertaken to advertise and promote the "Scott's Liquid Gold" mark. The amount of merchandising, advertising and promotion between 1953 and 1965 remained relatively small, however. The total retail sales and advertising-promotion figures for defendant set forth above reflect primarily, though not solely, activities in the Denver market.

While the magnitude of these figures is less humble when examined in reference to the Denver market than the national market, it must be kept in mind that the Denver market was not a small one during this period. The United States Census reported a Denver population of 415,786 in 1950 and 493,807 in 1960. In the context of a market of this size average yearly advertising and promotion outlays of $2,000 to $2,500 are not compelling evidence of secondary meaning.

■ I do not doubt a substantial number of consumers in Denver were aware of the existence of Scott's Liquid Gold products prior to 1965, but this fact does not demonstrate that defendant had by then acquired secondary meaning in the endorsement "Scott's". As Professor McCarthy has commented:

Surnames are one of the classes of marks which do not have the status of a protectable status only after they have had such an impact upon a substantial part of the buying public as to have acquired "secondary meaning". That is, the public has come to recognize the personal name as a symbol which identifies and distinguishes the goods or services of only one seller.

While there had been use of "Scott's" by defendant prior to 1965, I am not persuaded

---

61. *See, e. g., Anheuser-Busch, Inc. v. Bavarian Brewing Company*, 264 F.2d 88 (6th Cir. 1959); 2 *McCarthy* § 26:10.

62. *Ibid.*

63. The record also contains specific evidence of sales of, and orders for, ScotTowels in the

Denver area as early as 1915 (DX–149, 155). A sales representative had responsibility for the Denver area as early as 1919 (PX–154, 156). The record also establishes extensive advertising in publications with Colorado circulations prior to 1965.

that its limited activities during that time had had a sufficient impact on consumers in that market so that they would have associated a new household cleaner endorsed with "Scott's" with the same source as the Liquid Gold products. Accordingly, I conclude that plaintiff had priority in the Denver market as well.

## IV. LACHES

A party may be barred from relief in a trademark infringement action if it it has been guilty of unreasonable delay in bringing suit and that delay has irreparably prejudiced his opponent.[64] Such inexcusable and prejudicial delay may bar not only a monetary award, but injunctive relief as well.[65] Laches is an equitable doctrine, however, and the propriety of its application, as well as the scope of any bar, must be determined with reference to the facts of each case and only after weighing the interests of the parties and the public interest. 2 *McCarthy* § 31:7.

Recognition of the equitable nature of the laches doctrine is important in the context of this case. In assessing the plaintiff's conduct we must do more than determine the length of the period between notice of the existence of a Scott's Liquid Gold product and the filing date of this action. The ultimate question is not simply the duration of that period but rather whether it appears, without the benefit of hindsight, that a reasonably diligent person in plaintiff's position would have brought suit at an earlier time. Thus, for example, a plaintiff should not be held to have "slept" upon his rights unless a reasonable person in the same position would have perceived the possibility of confusion and completed the process of investigation and

evaluation at a substantially earlier date than he did. As the earlier analysis in this Opinion suggests, in a case of this character a determination of whether one has a claim which he can legitimately ask a court to hear requires, in the absence of substantial evidence of actual confusion, an evaluation of a number of different factors and a prediction as to how their interaction will affect the perceptions of consumers.

Similarly, equitable considerations must play a role in determining the existence and significance of any alleged prejudice to the defendant. It is a weighing process which involves more than finding how much the defendant has spent on advertising during any period of inexcusable delay. The ultimate question is whether, given all the surrounding circumstances, the nature and extent of the particular form of remedy will impose an unjustifiable burden on the defendant.

With these general principles in mind I turn to the facts of this case. During the mid-sixties, possibly as early as 1963 or 1964, several marketing and sales people in plaintiff's employ learned of the existence of a Scott's Liquid Gold cleaner. In 1967, Robert Bramson, plaintiff's trademark counsel, was apprised of defendant's existence through a trademark search report commissioned by plaintiff. The Scott's Liquid Gold name was called to Mr. Bramson's attention at that point in a letter from an attorney whom Bramson had asked to comment on the search report. The matter was not then pursued.

In 1968 defendant's total retail sales were $36,000 and were confined almost entirely to the Denver area.[66] Adver-

**64.** *Anheuser-Busch, Inc. v. DuBois Brewing Company*, 175 F.2d 370 (3rd Cir. 1949); *Adam Hat Stores v. Lefco*, 134 F.2d 101 (3rd Cir. 1943); *Proctor & Gamble Co. v. J. L. Prescott Co.*, 102 F.2d 773 (3rd Cir. 1939); *Alfred Dunhill of London, Inc. v. Kasser Distillers Products Corp., supra; J. A. Dougherty's Sons v. Kasko Distillers Products Corp.*, 35 F.Supp. 561 (E.D.Pa.1940).

**65.** *Anheuser-Busch, Inc. v. DuBois Brewing Co., supra;* 2 *McCarthy* § 31:2.

**66.** By 1967 defendant was selling nationally in the industrial and institutional markets. So far as the record in this case reveals, however, there would have been no reason for plaintiff and its counsel to expect likelihood of confusion from defendant's use of "Scott's" in connection with its institutional and industrial products. The facts concerning the channels of trade in the household products market, the

tising and promotion outlays were $12,000. Accordingly, the interface between defendant's product and plaintiff's household products in the channels of trade and in the advertising media was extremely limited. And, as of that time, there had been no significant evidence of actual confusion. While I have held, based on the fully developed record before me, that plaintiff had acquired secondary meaning in the use of Scott as an endorsement for a household cleaner by 1965 and, accordingly, that there was a likelihood of confusion from its use by another at that time for that purpose, given this extremely limited interface, I do not believe plaintiff can be held to have slept on its rights during this period. While it may have been possible at this point with an in-depth study and analysis to forecast what ultimately occurred, I am not convinced that a reasonable man in plaintiff's position would have focused on the risk and pursued the matter in that fashion at that time.

▇▇▇ I do not suggest that small volume alone is an excuse for delay in bringing trademark infringement suits or that a trademark holder may wait to see how successful his competitor may become. What may reasonably be expected of such a holder, by way of perception and action, however, necessarily depends on the nature of the infringement and the surrounding circumstances. In cases where the defendant has been selling competing goods under a mark which is the same or similar to an inherently distinctive mark of the plaintiff, for example, notice of even a small volume of sales will ordinarily constitute notice of a likelihood of confusion and place upon plaintiff the duty of prompt action. However, where as here, the source of confusion is the defendant's use of a common name like Scott, which has been used by others in different markets without confusion, on a

product which does not compete with that of plaintiff, the likelihood of confusion is not readily apparent, and it is to be expected that a reasonable holder of trademark rights may not perceive the *possibility* of confusion and, accordingly, the necessity of investigation until there has been substantial common exposure in the same channels of trade and information dissemination.[67]

The conclusion that a reasonable man might well not perceive a likelihood of confusion in the 60's, is supported by the fact that the parties themselves did not in fact have such a perception during that period even though each was aware of the existence and products of the other. I am convinced not only that Bramson did not perceive the likelihood of confusion in 1967 and 1968, but also that defendant did not realize this potential when it went public in late 1969 and embarked on its massive promotion campaign in early 1970. Defendant was simply carrying forward the name previously used by it and its predecessors and I believe it did not occur to Mr. Goldstein that defendant would benefit from plaintiff's good will.

The 70's present a different picture. During 1970 and 1971 defendant's household cleaning products were sold in volume to the same wholesaler and chain store buyers as plaintiff's household products, those products began to appear on shelves in the same sections of supermarkets around the country, and the parties' advertising and promotion efforts began to address the public through the same media avenues. In 1970, defendant's retail sales exceeded $1,000,000 and its advertising reached $688,000. The 1971 figures were $6,000,000 and $3,000,000, respectively. While no significant evidence of actual confusion had come to the attention of the parties by early 1971, I find that a reasonably observant and dili-

---

customers in that market, and the circumstances surrounding their purchasing decisions is fully developed in the record of this case. There has been no similar development, however, regarding the industrial and institutional areas.

67. I am aware of the existence of Second Circuit authority which suggests that there may be a greater duty of diligence in a non-competing goods situation, but, like the court in *Alfred Dunhill of London, Inc. v. Kasser Distiller Products Corp.*, 480 F.2d 917 (3rd Cir. 1973), I find them unpersuasive.

gent person in plaintiff's position would have initiated an investigation of the likelihood of confusion problem at that time. Plaintiff took no action in early 1971, however.

In August of 1972, defendant's registration application was published and plaintiff, after securing a thirty day extension to investigate, decided not to oppose. While it thus considered the possibility of confusion in the Fall of 1972, it was not until early 1973 that plaintiff, prompted in part by customer letters evidencing confusion,[68] became concerned enough to meaningfully pursue the matter. Once prompted to act it pursued its investigation in a responsible and reasonably expeditious manner. Among other things, it commissioned the image study by CIR, conducted in April through June of 1973, to ascertain whether confusion existed in the marketplace concerning the sponsorship of Scott's Liquid Gold. (Markus Tr. Tr. pp. 458–461; Weygandt Tr. Tr. pp. 851–852). This suit was filed on November 21, 1973. Plaintiff was entitled to delay from the beginning of 1973 to the date of the filing of the complaint for the purpose of investigating and marshalling evidence on the relevant issues. *Alfred Dunhill of London, Inc. v. Kasser Distillers Products Corp., supra*; 4 *Callman* § 87.-3(b)(1).

■ I conclude that a reasonably diligent holder of trademark rights in a case of this kind could be expected to have initiated its suit approximately two years before plaintiff initiated this action, but that it is not chargeable with any longer period of inexcusable delay.

---

**68.** The initial letter evidencing actual confusion was received in October of 1972. (PX–119). A few others followed prior to the filing of suit. (PX–115–118).

**69.** I do not agree with defendant that plaintiff's delay caused it prejudice through the death of key witnesses and the destruction of defendant's documents in the 1965 flood. One of the witnesses who died would have given testimony concerning plaintiff's contacts with defendant in 1965. That testimony would have been irrelevant in view of my conclusion that even if plaintiff had knowledge of defendant's existence in 1965, it would not reasonably have

■ During plaintiff's two years of inexcusable delay, defendant was advertising and promoting Scott's Liquid Gold at a rate in excess of $10,000,000 per year. This is legally cognizable prejudice. *Fruit Industries v. Bisceglia Bros. Corporation*, 101 F.2d 752 (3rd Cir. 1939); *Proctor & Gamble Co. v. J. L. Prescott Co.*, 102 F.2d 773 (3rd Cir. 1939). Accordingly, I agree with defendant that it suffered prejudice as a result of plaintiff's delay.[69]

■ My finding that defendant did not deliberately seek to garner plaintiff's good will makes it unnecessary to consider whether these conclusions with respect to the laches issues would bar plaintiff from an accounting of defendant's profits. Such accounting would be inappropriate in any event under the circumstances of this case. *Champion Spark Plug Co. v. Sanders*, 331 U.S. 125, 67 S.Ct. 1136, 91 L.Ed. 1386 (1947); 2 *McCarthy* § 30:25. Those conclusions along with my finding concerning defendant's intent do dictate, however, that plaintiff be barred from a recovery of damages.

■ The remaining question is whether plaintiff's two years of delay and defendant's investment during that period should bar injunctive relief. As earlier indicated, the interests of the parties and the public must be weighed in the course of determining this issue.

From plaintiff's point of view, the consequences of a denial of the requested injunction would be that, to the extent the public continues to associate Scott's Liquid Gold with plaintiff as a source, plaintiff will be deprived of the ability to safeguard the

been expected to file suit at that time. Similarly, since plaintiff would not have been expected to bring suit until well after 1965, even plaintiff's prompt initiation of suit would not have permitted defendant to benefit from either Rose Hartman's testimony or from evidence destroyed in the flood since both events occurred in 1965. Finally, Mrs. Goldstein's testimony, while it might have been available to defendant had plaintiff sued prior to her death in 1971, would have been no more probative on the nature of Scott's or the Hartman's business than was Jerome Goldstein's testimony.

considerable good will which it has spent fifty years and hundreds of millions of dollars to develop. While I do not find the evidence that defendant's products are hazardous or of low quality to be persuasive, the law recognizes the importance of a business's right to protect its "good name" through its own quality control, complaint follow-up, and the like.

From defendant's point of view, the granting of an injunction would foreclose it from using "Scott's Liquid Gold" on its household cleaning products, a mark which it has expended large sums over the course of seven years to promote. An injunction would not, however, bar defendant from utilizing the mark "Liquid Gold" in connection with the sale of those products, and this is important, I believe, in balancing the equities. "Liquid Gold" is an inherently distinctive, strong mark. It is the dominant segment of defendant's current mark both because it has been used as the name of the product itself, as distinguished from an identification of the source of the product, and because it has consistently been given prominence, in position, size, and type face, on defendant's packaging and advertising. For these reasons it is to be expected that the vast majority of consumers who have had experience with a "Scott's Liquid Gold" product will associate a product, with similar packaging, sold under the name "Liquid Gold" with the products they have previously used. This does not mean that defendant would not be better off if it were permitted to continue business as usual. It does mean, however, that the requested injunction would preserve for defendant most of the good will it has established in the marketplace.[70]

█ The final factor to be considered is the interest of the public. The courts have traditionally been reluctant to apply the doctrine of laches in bar of injunctive relief in large part because the necessary result is that the confusion which has been shown to exist in the marketplace will be permitted to continue. Consumers have an important interest, distinct from that of the vendors, in being able to rely on indications of source and in receiving what they are under the impression they are buying. For this reason an injunction designed to eliminate confusion as to source should not be denied unless its issuance would impose a grave and unjust burden upon the defendant.

█ Given the relatively short duration of defendant's inexcusable delay, the fact the requested injunction will preserve for the defendant most of the benefit of its labors, and the desirability, from the public's point of view, of eliminating confusion in the marketplace, I hold that laches does not bar injunctive relief in this case.[71]

## V. FRAUD, ABANDONMENT AND BAD FAITH

█ Defendant's charge of fraud, set forth in its counterclaim for cancellation of a number of plaintiff's registrations, is three-fold.[72] First, defendant asserts that

---

**70.** This fact and the shorter period of inexcusable delay distinguish this case from *Fruit Industries v. Bisceglia Bros. Corporation*, 101 F.2d 752 (3rd Cir. 1939) and *Proctor & Gamble Co. v. J. L. Prescott Co.*, 102 F.2d 733 (3rd Cir. 1939).

**71.** Plaintiff's decision not to oppose defendant's registration of the mark "Scott's Liquid Gold" does not constitute acquiescence on its part in defendant's use of that mark. 2 *McCarthy* § 31:14. This is not a case like *Anheuser-Busch* where plaintiff dismissed an infringement suit against defendant, proceeded to sue many others, and then thirty years later sued defendant for infringement. In that case, defendant reasonably concluded from plaintiff's actions that plaintiff would not assert its trademark rights against defendant. Here, while plaintiff's ultimate silence in the opposition proceedings after its announced intention to investigate defendant and its products might be taken as a decision not to enforce its rights against defendant, its actions are equally compatible with what in fact did develop, i. e., further investigation of defendant's business and use of its mark culminating in a decision some months later to file suit.

**72.** A disposition of this counterclaim favorable to defendant would not alter the conclusion previously reached that plaintiff is entitled to relief since such a disposition would not affect plaintiff's common law rights. *Alfred Dunhill of London, Inc. v. Kasser Distillers Products*

in attempting to register the mark "Scott" for facial tissue in 1973, plaintiff reminded the Patent Office Examiner of his finding, earlier on in the application procedure, that "a search reveals no mark confusingly similar to applicant's". (DX–543 at p. 11). At this time, defendant contends, plaintiff knew that defendant's registration of Scott's Liquid Gold had issued and had concluded that there was a likelihood of confusion between defendant's mark and the Scott mark plaintiff sought to register. (Weygandt Tr. Tr. at pp. 1282–1284).

▇ I find no merit to defendant's contention. The information which plaintiff allegedly concealed was simply not material to the issue before the Examiner—whether plaintiff's application for registration of a "Scott" mark for facial tissues should be granted. *Morehouse Manufacturing Corp. v. J. Strickland & Co.,* 407 F.2d 881 (Cust. & Pat.App.1969).

▇ Secondly, defendant argues that, although plaintiff had acquiesced in several third party uses of the mark "Scott" or variations thereof, it nevertheless made the following statement to the Patent & Trademark Office with respect to several trademarks (DX–535–543; DX–17; DX–30–31):

> . . . that no other person, firm, corporation, or association to the best of [plaintiff's] knowledge and belief has the right to use such trademark in commerce which may lawfully be regulated by Congress either in the identical form thereof or in such near resemblance thereto as might be calculated to deceive. . . .

For the same reasons I found that such third-party uses did not weaken plaintiff's marks, i. e., because of differing uses and significant differentiation in the marks, I conclude that there has been no acquiescence by plaintiff in the use of the same or confusingly similar marks. Thus, the statement referred to by defendant is not false.

Finally, defendant challenges statements by plaintiff's representatives in Section 15 affidavits filed with the Patent Office to make several of plaintiff's registrations incontestable.[73] Defendant claims that the following statement by the affiants with respect to these applications was false (DX–21; DX–23):

> . . . there is no proceeding involving said rights pending in the Patent Office or in a court and not finally disposed of.
>
> . . .

As to four of the registrations,[74] defendant claims this statement was false because plaintiff was then opposing an application by Scott-Rice Co. for registration of "SCOT–TAG" for "weatherproof labels for attachment using wire or string" and an application of S. D. Scott Printing Company, Inc. for registration of "SCOTT-GRAPH" for "pamphlets, booklets, and posters containing half-tone photographic prints". I disagree.

▇ The affidavits track the language of Section 15. They assert "that there has been no final decision adverse to registrant's claim of ownership of said mark, of its right to register the same or maintain it on the register; and that there is no proceeding involving any of said rights pending and not disposed of either in the Patent Office or in the Courts". (E. g., DX–537). The "said rights" referred to are plaintiff's ownership of its registered mark for the stated goods, its rights to register that mark and its right to maintain that registration. *The Norac Company, Inc. v. Occidental Petroleum Corporation,* 189 U.S.P.Q.

---

*Corp.,* 350 F.Supp. 1341, 1368–69 (E.D.Pa. 1972), *aff'd* 480 F.2d 917 (3rd Cir.1973).

**73.** I assume, without deciding, that a false Section 15 affidavit may provide a basis for cancellation of the underlying registration. *See Crown Wallcovering Corp. v. The Wall Paper Manufacturers Limited,* 188 U.S.P.Q. 141 (T.T. A.B.1975); *Duffy-Mott Company v. Cumberland Packing Company,* 424 F.2d 1095 (Cust. & Pat.App.1970).

**74.** No. 783,234, "Lady Scott" for facial tissue and toilet paper; No. 787,375, "S" and "Scott" for sandwich bags, wax paper and plastic cups; No. 787,576, "S" and "Scott" for toilet tissue, facial tissue, paper towels, paper napkins and wax paper; and No. 787,636, "S" and "Scott" for sanitary napkins.

55 (T.T.A.B.1975). None of these rights were at issue in the proceedings to which defendant refers. Moreover, even if defendant's construction of the affidavits was legally correct, I cannot find in this context that there was any intent to mislead or reckless disregard of the truth.

As to the other two registrations, plaintiff made an honest mistake which it corrected as soon as it was discovered without prejudice to the Patent Office's determination. (PX–269; PX–270; Weygandt Tr. Tr. at pp. 882–889, 902–904, 1170–1176). In sum, I do not find that any of plaintiff's marks should be cancelled or denied enforcement because they were obtained or maintained by fraud.

■ Nor do I find merit to defendant's contention that plaintiff has abandoned any of its marks. With respect to Registration No. 714,852 for paper and plastic cups, although manufacture of such items has stopped, plaintiff has continued to sell its existing inventory, utilizing the mark in question. (Lippincott Tr. Tr. at pp. 720–21). Moreover, the evidence reflects that the composite mark, the subject of the two other registrations which defendant challenges as abandoned, is still in use at least on Scott C-fold paper towels. (PX–252x; Lippincott Tr. Tr. at pp. 712–16). Thus, Registration No. 787,576 which includes paper towels among the products covered has not been abandoned. As plaintiff points out, the third registration, No. 787,636, for sanitary napkins has become incontestable. Defendant's citation of one instance where sanitary napkins did not contain the mark in question (PX–251o) does not meet its burden of demonstrating non-use or intent to abandon the mark. 15 U.S.C. §§ 1127, 1156.

■ Finally, given the evidence heretofore catalogued, it is apparent that plaintiff has not prosecuted this action in bad faith. That plaintiff has seriously considered marketing a household cleaner and may still do so in the future seems to this Court irrelevant to the issue posed by defendant's bad faith counterclaim even if those facts played a role in plaintiff's decision to bring this suit.

## IV. CONCLUSION

Since I have found a likelihood of confusion caused by defendant's use of its mark "Scott's Liquid Gold" on liquid chemical household cleaning products and, since I have found no merit to any defenses raised by defendant to plaintiff's application for injunctive relief, I conclude that defendant should be enjoined from using the mark "Scott's Liquid Gold" on such products. However, since the source of the confusion is the inclusion in defendant's mark of "Scott's" as an indication of the source of its products, the injunction will not foreclose defendant from marketing its household cleaning products under the mark "Liquid Gold". Plaintiff's applications for damages, accounting, and attorney's fees will be denied.

Submit order.

## APPENDIX A

### SCOTT PAPER COMPANY PLEADED REGISTATIONS

| MARX | GOODS (For Which Use Is Claimed) | REGISTRATION NO. | REGISTRATION DATE |
|---|---|---|---|
| 1. ScotTissue | Paper Towels, Paper Table-covers, Paper Diapers and Toilet Paper | 106,690 (PX 92) | October 26, 1915 |
| 2. ScotTowels | Paper Towels | 297,302 (PX 93) | September 6, 1932 |
| 3. Scotties | Facial Tissues | 303,536 (PX 94) | May 30, 1933 |
| 4. ScotTowels | Paper Towels | 515,159 (PX 95) | September 13, 1949 |
| 5. Scotkins | Paper Napkins | 559,929 (PX 96) | June 10, 1952 |
| 6. ScotTissue | Paper Towels and Toilet Paper | 602,391 (PX 97) | February 22, 1955 |

SCOTT PAPER COMPANY PLEADED REGISTRATIONS—Continued

| MARX | GOODS (For Which Use Is Claimed) | REGISTRATION NO. | REGISTRATION DATE |
|---|---|---|---|
| 7. Scotties | Facial Tissues, Cleansing Tissues, Hygienic Handkerchiefs made from Paper, and Absorbent Tissues | 607,311 (PX 98) | June 14, 1955 |
| 8. Scott | Paper Products—Namely, Paper Towels, Paper Napkins, Toilet Tissues, Waxed Paper, and Sandwich Bags of Paper | 669,919 (PX 99) | November 18, 1958 |
| 9. Scott | Beverage and Food Receptacles of Paper and Plastic | 714,852 (PX 100) | May 9, 1961 |
| 10. Lady Scott | Facial and Toilet Tissue | 783,234 (PX 101) | January 12, 1965 |
| 11. Scott and Design | Sandwich Bags of Plastic Sheeting and Waxed Paper and Beverage Containers of Paper and Plastic | 787,375 (PX 102) | March 30, 1965 |
| 12. Scott and Design | Paper Products—Namely, Toilet Tissue, Facial Tissue, Paper Towels, Paper Napkins, Waxed Paper and Plastic Sheeting Used as a Wrap | 787,576 (PX 103) | March 30, 1965 |
| 13. Scott and Design | Sanitary Napkins | 787,636 (PX 104) | March 30, 1965 |
| 14. Scott | Plastic Wrap, Paper Placemats, and Paper Tablecloths | 852,338 (PX 105) | July 9, 1968 |
| 15. Scott | Dispensers for Napkins, Towels, Facial Tissue, Bathroom Tissue, Drinking Cups, Plastic Wrap, Waxed Paper, Wipers and Sanitary Napkins | 854,412 (PX 106) | August 13, 1968 |
| 16. Scott | Sanitary Napkin and Drape Sheets Made of Paper | 862,055 (PX 107) | December 17, 1968 |
| 17. Scott | Glass Cleaner Concentrate | 904,442 (PX 108) | December 15, 1970 |
| 18. Family Scott | Bathroom Tissue | 920,228 (PX 109) | September 14, 1971 |
| 19. Scott | Facial Tissues | 966,495 (PX 110) | August 21, 1973 |